Case 4:25-cr-00306   Document 1   Filed on 06/10/25 in TXSD   Page 1 of 9

United States Courts
Southern District of Texas
**FILED**
*June 10, 2025*
Nathan Ochsner, Clerk of Court

Sealed
Public and unofficial staff access to this instrument are prohibited by court order

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** § § | **4:25-cr-306** |
| v. § § | Criminal No. _____ |
| **AUGUSTINE "AUSTIN" ONYEKA** § § § § | **UNDER SEAL** |
| **Defendant.** § | |

# INDICTMENT

The Grand Jury charges:

## GENERAL ALLEGATIONS

At all times material to this Indictment, unless otherwise specified:

1. The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2. The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3. A controlled substance assigned to "Schedule II" meant that the drug had a high potential for abuse and a currently accepted medical use in treatment in the United States, or the drug had a currently accepted medical use with severe restrictions.

4. Pursuant to the CSA and its implementing regulations:

   a. Hydrocodone was classified as a Schedule II controlled substance. Hydrocodone was used to treat severe pain. Hydrocodone, as with other opioids, was highly addictive. Tablets combining 10 mg of hydrocodone bitartrate and 325 mg of acetaminophen ("hydrocodone 10-325 mg") was sometimes marketed under the brand name Norco. The 10-325 mg pill was the highest, short-acting combination-pill form of the drug commercially available, and it had substantial street value and was in high demand on the Houston area's black market.

   b. Oxycodone was classified as a Schedule II controlled substance. Oxycodone was used to treat severe pain. Oxycodone, as with other opioids, was highly addictive. The highest-strength short-acting oxycodone pill commercially available—and the one most in demand on the Houston area's black market—contained 30 mg of oxycodone hydrochloride.

   c. Carisoprodol, a Schedule IV drug classified as a muscle relaxant; alprazolam, a Schedule IV drug used to treat anxiety; and promethazine with codeine syrup, a Schedule V drug used as a cough suppressant had substantial street value and were in high demand on the Houston area's black market. Together, carisoprodol 350 mg, alprazolam 2 mg, and promethazine with codeine were "Potentiators," so-called because they enhanced the high from opioids like hydrocodone and oxycodone

5. With exceptions not applicable here, only appropriately licensed and registered pharmacies could dispense controlled substances, and only pursuant to legitimate prescriptions issued by a medical practitioner acting in the usual course of his professional practice. *See* 21 C.F.R. §§ 1306.04 and 1306.06. The issuing physician and the pharmacist who filled the prescription for a controlled substance shared a

corresponding responsibility for its proper prescribing and dispensing. *See* 21 C.F.R. § 1306.04. In addition, Section 1306.04 instructed that:

> [a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of Section 309 of the Act (21 U.S.C. § 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

6. Under the CSA, it was unlawful for individuals to knowingly or intentionally distribute and dispense controlled substances via a pharmacy in a manner unauthorized by law; that is, absent a legitimate prescription issued for a legitimate medical purpose in the usual course of professional practice.

### DEFENDANT AND RELEVANT ENTITIES AND INDIVIDUALS

7. Smarthead, Inc. d/b/a Tulipanes Pharmacy ("Tulipanes") was a Texas corporation established on or about June 28, 2017. Tulipanes was a pharmacy licensed by the Texas State Board of Pharmacy ("TSBP") and registered with the Drug Enforcement Administration ("DEA") to dispense controlled substances in a manner authorized by law. Tulipanes was located at 5182 Avenue H, Rosenberg, Texas 77471, in the Southern District of Texas.

8. **AUGUSTINE "AUSTIN" ONYEKA** filed the certificate of formation for Tulipanes with the Texas Secretary of State, and was listed as the pharmacy's registered agent, co-director, and organizer.

9. Pharmacist 1 was a pharmacist licensed by TSBP and registered with DEA. Pharmacist 1 was the co-director and pharmacist-in-charge ("PIC") at Tulipanes.

## COUNT ONE
**Conspiracy to Unlawfully Distribute and Dispense Controlled Substances**
**(21 U.S.C. § 846)**

10. Paragraphs 1 through 9 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

11. From in or around June 2017, and continuing through at least in or around December 2020, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, Defendant,

**AUGUSTINE "AUSTIN" ONYEKA,**

knowingly and intentionally combined, conspired, confederated, and agreed with Pharmacist 1 and others known and unknown to the Grand Jury, to violate Title 21, United States Code, Sections 841(a)(1), that is, to knowingly and intentionally distribute and dispense mixtures and substances containing detectable amounts of Schedule II controlled substances, including hydrocodone and oxycodone; Schedule IV controlled substances, including alprazolam and carisoprodol; and Schedule V controlled substances, including promethazine with codeine, while knowing that such distribution and dispensing was unauthorized.

### Purpose of the Conspiracy

12. It was the purpose of the conspiracy for **AUGUSTINE "AUSTIN" ONYEKA**, Pharmacist 1, and their coconspirators, known and unknown to the Grand Jury, to unlawfully enrich themselves by, among other things: (a) unlawfully distributing and dispensing hydrocodone, oxycodone, and the Potentiators; (b) generating large profits from the unlawful sale of these controlled substances; and (c) diverting the proceeds from the

unlawful sales for the personal use and benefit of **AUGUSTINE "AUSTIN" ONYEKA**, Pharmacist 1, and their coconspirators.

## Manner and Means of the Conspiracy

The manner and means by which **AUGUSTINE "AUSTIN" ONYEKA,** Pharmacist 1, and others known and unknown to the Grand Jury sought to accomplish the purpose and object of the conspiracy included, among other things:

13. Pharmacist 1 maintained a Texas Pharmacy License from the TSBP and a registration with DEA. Pharmacist 1 served as PIC for Tulipanes from on or about June 28, 2017 to on or about March 28, 2023.

14. At TSBP's pre-startup inspection of Tulipanes, for which both **AUSTIN "AUSTIN" ONYEKA** and Pharmacist 1 were present, Pharmacist 1 certified that she received and understood a copy of TSBP's *"Red Flags" Checklist for Pharmacies: YOU MIGHT BE A PILL MILL IF…"* (the "Red Flags Checklist"). In or around 2018, Pharmacist 1 posted two copies of the Red Flags Checklist in the pharmacy, near the computer utilized by **AUGUSTINE "AUSTIN" ONYEKA** and Pharmacist 1 for dispensing, and by the exit to the pharmacy, both copies regularly visible to **AUGUSTINE "AUSTIN" ONYEKA**. On or about February 20, 2020, Tulipanes received a letter addressed to Pharmacist 1, about which **AUGUSTINE "AUSTIN" ONYEKA** was made aware, warning about Pharmacist 1's corresponding responsibility to ensure prescriptions were issued by a practitioner in the usual course of her professional practice, and for a legitimate medical purpose.

15. Together, **AUGUSTINE "AUSTIN" ONYEKA** and Pharmacist 1 paid wholesalers of pharmaceutical drugs over-market prices for oxycodone 30 mg,

hydrocodone 10-325 mg, and the Potentiators; and purchased non-controlled substances that Tulipanes did not need or want, because Tulipanes could still sell the drugs for hundreds or even thousands of dollars, in cash, per bottle.

16.   **AUGUSTINE "AUSTIN" ONYEKA** and Pharmacist 1 distributed and dispensed controlled substances in two ways:

   a. First, **AUGUSTINE "AUSTIN" ONYEKA** and Pharmacist 1 filled, and caused to be filled, purported prescriptions for hydrocodone, oxycodone, and Potentiators at Tulipanes, knowing that such prescriptions were not issued for a legitimate medical purpose by a practitioner acting within the usual course of professional practice.

   b. Second, with the knowledge and consent of Pharmacist 1, **AUGUSTINE "AUSTIN" ONYEKA** sold—in bulk, directly to drug traffickers that **AUGUSTINE "AUSTIN" ONYEKA** called his "homeboys," without the involvement of physicians, patients, or prescriptions—controlled substances that Tulipanes purchased from wholesalers.

17.   In an effort to make Tulipanes' unauthorized dispensing and distribution of controlled substances look more legitimate to wholesalers, **AUGUSTINE "AUSTIN" ONYEKA** and Pharmacist 1 manipulated and falsified Tulipanes' dispensing data in the pharmacy's drug utilization reports ("DURs"), which the pharmacy was required to submit to wholesalers to be able to purchase the controlled substances, and which **AUGUSTINE "AUSTIN" ONYEKA** and Pharmacist 1 knew would not be verified in any way by the wholesalers, including Wholesaler A and Wholesaler B.

18.   **AUGUSTINE "AUSTIN" ONYEKA** brought to Tulipanes his existing relationships with sales representatives ("brokers") from Wholesaler A, Wholesaler B, and other wholesalers, to help facilitate Tulipanes' purchases of hydrocodone, oxycodone, and the Potentiators. Just as he did with falsifying the DURs, **AUGUSTINE "AUSTIN"**

**ONYEKA** coached Pharmacist 1 about how to order controlled substances from the brokers. For example, **AUGUSTINE "AUSTIN" ONYEKA** informed Pharmacist 1 "[a] lot of times, just email [Broker A] the controls you want and he will add little things to make [non-controls] up."

19. After Pharmacist 1 learned the ropes from **AUGUSTINE "AUSTIN" ONYEKA**, Pharmacist 1 began dealing directly with Broker A, who eventually took orders for controlled substances directly from Pharmacist 1; however, **AUGUSTINE "AUSTIN" ONYEKA** continued to deal directly with Broker A and other brokers through whom Tulipanes obtained controlled substances.

20. In an effort to avoid scrutiny by TSBP and DEA, **AUGUSTINE "AUSTIN" ONYEKA** and Pharmacist 1 also underreported the pharmacy's dispensing of controlled substances to the State's Prescription Monitoring Program ("PMP").

21. **AUGUSTINE "AUSTIN" ONYEKA** and Pharmacist 1 operated Tulipanes as a cash-only business, and they attempted to deposit the cash in a manner designed to conceal the crime in a manner that would avoid triggering cash reporting requirements imposed upon financial institutions under the law.

22. In this way, **AUGUSTINE "AUSTIN" ONYEKA** and Pharmacist 1 caused Tulipanes to acquire, and to unlawfully distribute and dispense, in a manner not authorized by law, approximately 80,000 pills of oxycodone 30 mg and 136,500 pills of hydrocodone 10-325 mg, and other controlled substances, knowing and intending that Tulipanes would and did distribute and dispense the controlled substances in a manner not authorized by law.

All in violation of Title 21, United States Code, Section 846.

## NOTICE OF CRIMINAL FORFEITURE
### (21 U.S.C. § 853)

23. The allegation contained in Count 1 of this Indictment is hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 21, United States Code, Section 853.

24. Pursuant to Title 21, United States Code, Section 853, upon conviction of an offense in violation of Title 21, United States Code, Section 846, Defendant,

**AUGSTINE "AUSTIN" ONYEKA,**

shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offense and any property used, and intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offense.

25. If any of the property described above, as a result of any act or omission of Defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    d. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to a money judgment and forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL

**Original Signature on File**

FOREPERSON

NICHOLAS J. GANJEI
UNITED STATES ATTORNEY

LORINDA LARYEA, ACTING CHIEF
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

_____
YAEL MASH
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE